IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:05MJ218

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ) <br> SWANNANOA VALLEY FAMILY ) <br> MEDICINE, DR. JOHN KELLY ) <br> 2296 U.S. HIGHWAY 70 ) <br> SWANNANOA, NORTH CAROLINA. ) <br> _____ ) | ORDER |

**THIS MATTER** is before the court upon the motion of John Jay Kelly, M.D. to return property seized from the medical practice known as Swannanoa Valley Family Medicine and Dr. John J. Kelly, pursuant to a search warrant. At the call of this matter on for hearing it appeared that the movant was present with counsel and that the government was present and from the evidence offered by the movant and the evidence offered by the government, the undersigned makes the following findings and enters the following order.

**1. Procedural History**

On July 22, 2005, Judge Lacy H. Thornburg, United States District Judge for the Western District of North Carolina, issued a search warrant based upon an application for search warrant presented by Mark M. Aysta, Special Agent for the Federal Bureau of Investigation. The search warrant issued by Judge Thornburg authorized a search of the business of Swannanoa Valley Family Medicine located in Swannanoa, North Carolina. The search warrant further authorized the seizure of various medical records, patient records, financial records and other documents relating to the medical practice of Dr. John J. Kelly who is the physician who operates his medical practice as Swannanoa Valley Family

Medicine. The documents, items and things to be seized are set forth more specifically in the search warrant. On July 26, 2005 the search warrant was executed and files containing records of treatment of patients, financial documents, computers and other items were taken into custody by the FBI. These items were secured in the Asheville, North Carolina office of the FBI for review.

On August 2, 2005, Dr. Kelly, by and through counsel, filed a motion entitled "Motion to Return or Provide Copies of Seized Records, To Return Property Unrelated of Criminal Investigation and To Unseal Affidavit in Support of Search Warrant". The government responded to this filing on August 4, 2005. In the response, the government asserted that Assistant United States Attorney Jill Westmoreland Rose had spoken with counsel for Dr. Kelly and had described a procedure for the retrieval of copies of various medical records and financial records of Dr. Kelly and specifically in regard to the copying of records of treatment of patients of Dr. Kelly. On October 12, 2005, Dr. Kelly, by and through counsel, filed a motion entitled "Amended Motion for Return of Patient's Medical Records and Other Properties". The government responded on October 18, 2005 again asserting and setting forth that a procedure had been developed so that copies could be made of the various records seized from Swannanoa Valley Family Medicine and Dr. John J. Kelly.

At the call of this matter it appeared to the court that Dr. Kelly was present and represented by Attorney Jack Stewart of Asheville, North Carolina and that the government was present through Assistant United States Attorney Jill Westmoreland Rose. After

discussion, the undersigned narrowed the issue to be determined at the hearing of the motions as set forth below.

## II.    Issue Presented

In moving to return seized property under Rule 41(g), Federal Rules of Criminal Procedure, the movant does not contend that such property was unlawfully seized or that it is unlawfully in the possession of the government. Instead, movant argues that such continued possession by the government is unduly burdensome in that such records are necessary for him to continue to treat his patients and to operate his medical practice. The movant contends that the records of Swannanoa Valley Family Medicine and Dr. John J. Kelly should be returned or, in the alternative, that a written procedure should be established to provide the movant with access to copies of the various records.

## III.    Summary of Testimony

Dr. Kelly testified that the government's proposal for him to photocopy his records is ineffective inasmuch as his method of record keeping - - where notes are recorded on half sheets of paper and then placed in an indexed fashion in a file - - is not receptive to copying and would be difficult to reproduce. Dr. Kelly also testified that he had never received a copy of any protocols setting forth in writing how he could obtain copies of records of treatment of patients or other records; that he did not steer patients to the FBI to retrieve their own files, and that he may have told some patients to contact their Congressman's office to help retrieve their files. Dr. Kelly also testified that he sent mailed a letter to his patients

3

concerning their medical records. In addition, Dr. Kelly testified that he had trouble retrieving tax records necessary for preparing a return by October 15, 2005. Further testimony revealed that such request was not made until October 11, 2005 and that the documents were provided the following week. Upon questioning by the court, Dr. Kelly testified that when a patient decides to go to a different medical practice for treatment and such medical practice requests the patient's medical records from his office, that Dr. Kelly simply makes a copy of his records of treatment and sends those copies to the new treating physician. Dr. Kelly has had no complaints from such transferee doctors concerning the usefulness or readability of such records. Dr. Kelly further testified that he scheduled visits for patients weeks in advance and that he usually saw twelve to fifteen patients per day, Monday through Friday and during the weekends he would visit nursing homes and see ten to twelve patients during those visits.

Several of Dr. Kelly's patients and two members of his staff testified. These witnesses stated they were having difficulty retrieving either their personal property or medical records from the FBI. These witnesses stated they were confused by an article that appeared in the Asheville Citizen-Times telling them to contact the FBI in regard to obtaining copies of records of medical treatment. Apparently an article was published in this newspaper advising patients to contact the FBI directly, when in fact the procedures that had been set up by government and orally communicated to prior counsel for Dr. Kelly provided

4

a method for either Dr. Kelly or another physician to request such documents.[1] The testimony at the hearing was unclear as to what was the source of the confusion created by the article published in the newspaper. What was clear was that the procedures were never formalized in a writing other than the government's responses to the motion or perhaps an E-Mail which was never presented to the undersigned as evidence.

Mark M. Avsta, Special Agent with the Federal Bureau of Investigation testified on behalf of the government. Agent Avsta testified that the records of Swannanoa Valley Family Medicine were secured in a room at the FBI office in Asheville. The records are available for copying by Dr. Kelly twenty-four hours a day, seven days per week. The records may be copied Monday through Friday during regular business hours by giving approximately one hour's notice to the FBI. The records are available for copying at other times by giving at least three (3) days notice to the FBI. Space is available in the room where the records are located sufficient upon which two copiers may be placed so that the records may be copied. Agent Avsta testified that no one who had followed the unwritten procedures had been denied access to the records.

### IV. Motion for Return of Seized Documents Under Rule 41(g), Federal Rules of Criminal Procedure

Movant seeks return of the original documents seized by the FBI pursuant to a search

---

[1] The court notes that much of the patient testimony concerned a family member appearing or calling the FBI requesting that the FBI give them, not the actual patient, a copy of a family member's medical records. This, of course, is simply impermissible under the Privacy Act and HIPPA.

warrant issued by the district court. Rule 41(g), Federal Rules of Criminal Procedure, provides, as follows:

> **(g)** **Motion to Return Property**. A person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return. The motion must be filed in the district where the property was seized. The court must receive evidence on any factual issue necessary to decide the motion. If it grants the motion, the court must return the property to the movant, but may impose reasonable conditions to protect access to the property and its use in later proceedings.

Fed.R.Crim.P. 41(g). Movant has not shown or argued that he is aggrieved by an "unlawful search and seizure of property," therefore, the motion for return of seized property must be summarily denied on that basis. Fed.R.Civ.P. 41(g)(emphasis added).

Movant instead argues that Rule 41(g) allows the court to fashion an equitable remedy even where there is no showing that the documents have been unlawfully seized. While this is not found in the actual text of the Rule as set forth above, it is found in the official Advisory Committee Notes to such Rule, as follows:

> As amended, Rule 41[g] provides that an aggrieved person may seek return of property that has been unlawfully seized, and a person whose property has been lawfully seized may seek return of property when aggrieved by the government's continued possession of it.

Fed.R.Crim.P. 41(g), Advisory Committee Notes, 1989 Amendments (emphasis added). The Advisory Committee goes on to relate that there is no standard set forth in the rule as to when property should be returned as to any aggrieved party, but instead opines that

> reasonableness under all the circumstances must be the test when a person seeks to obtain the return of property. If the United States has a need for the property in an investigation or prosecution, its retention of the property generally is reasonable. But if the United States' legitimate interests can be

6

> satisfied even if the property is returned, continued retention of the property would become unreasonable.

Id. The Advisory Committee concludes that the Rule does not provide "an all or nothing approach," and that the rule "contemplates judicial action that will respect both possessory and law enforcement interests."

Based on a close review of all material presented at the hearing, the arguments of respective counsel, and close review of the affidavit underlying the search warrant, the government has shown "a need for the property in an investigation or prosecution"; therefore, the government's continued retention of the property is reasonable. Id.

The next inquiry is whether the government's legitimate interests can be satisfied "even if the property is returned." Id. In this case, the question is whether retention of a copy of all such records by the government will satisfy the government's interests, which are investigation and prosecution of possible crimes. Rules 1002 and 1003 of the Federal Rules of Evidence[2] provide some guidance:

**Rule 1002. Requirement of Original**

To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.

**Evidence Rule 1003. Admissibility of Duplicates**

A duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original.

---

[2] Rule 1004 also applies where the original is unavailable or in the possession of a party opponent.

Fed.R.Evid. 1002 & 1003. The court finds that (1) a felony criminal investigation is ongoing concerning billing practices and prescription practices of movant, (2) that, based on the warrant issued by the district court, there exists probable cause to believe that the documents seized may contain evidence of criminal conduct, (3) that documents that actually contain evidence indicating criminal wrongdoing would likely be submitted to a grand jury, and (4) if an indictment is returned, the government would likely rely on such documents to prove its case-in-chief and move for their admission into evidence. On the other hand, the court finds that (1) such documents have no tangible value to movant in that they are not negotiable instruments or other valuable property, (2) such documents have a high intangible value to movant in that they are necessary for the continued operation of his business, and (3) such documents have a high value to movant in that he has professional obligation to his patients to provide them with quality care, and that such documents contain important medical histories and other notes.

At the hearing, the movant did not present any evidence that he was unable to afford the cost of copying the records which were seized. See United States v. Hoskins, 639 F.Supp. 512 (W.D.N.Y. 1986)(citing Premises Known as Statler Towers v. United States, 787 F.2d 796, 798 (2d Cir. 1986)("we believe it proper to leave the burden of duplicating costs on a party who unsuccessfully moves before indictment for return of property seized under warrant."). Instead, the testimony focused on the inconvenience of making copies, the disruption such copying would cause to his practice, and the usefulness of such copies when compared with the original documents. The court carefully considered the testimony of Dr.

Kelly and his staff and must conclude that a number of his concerns can be resolved. Foremost, there was no evidence presented as to why a professional copy service could not be brought in to make copies of such documents. While Dr. Kelly testified that he would need to supervise the copying based on the unique manner in which his files are put together, there was no evidence that Dr. Kelly was actually the person in his office who physically created the files. This distraction from his practice is, therefore, alleviated simply by sending a staff person familiar with how Dr. Kelly puts his files together to either copy and make the files or supervise professional copiers in that task. As far as usefulness of the copies in his practice, Dr. Kelly's testimony that the copies he makes and sends to other doctors pass without complaint when a patient switches their treating physician from Dr. Kelly to another physician is telling; certainly, if other doctors unfamiliar with his method of record keeping can use copies, the court is certain that Dr. Kelly can make use of those files. In the end, the evidence tended to show if movant is only allowed to make copies of his files he will be inconvenienced in his practice.

The inconvenience to movant must be weighed against the legitimate needs of the government to have the records for effective law enforcement purposes and the potential for creating an evidentiary problem if this matter reaches trial. While the provision of medical services and the running of a business are activities which this society values, society has a "legitimate and pressing interest in criminal law enforcement." United States v. Leon, 468 U.S. 897, 946 (1984)(Brennan, J., dissenting). In this case, close review of the now unsealed but redacted affidavit reveals that the government is investigating serious charges

that involve alleged fraudulent billing, unlawful prescription of powerful controlled substances, and deaths resulting from such alleged over prescription. See Redacted Affidavit, at 7. Further, the United States pointed out that the typical practice in seizure of medical records in similar cases has been to allow the doctor to copy the documents seized.

Finding that the government's continued retention of the documents is reasonable, and that the movant's need for originals is outweighed by the governments need for originals, the court will deny movant's request for return of lawfully seized documents.

## V.  Production of Copies

In reading the Advisory Committee notes, the court concludes that the intent of the drafters of Rule 41(g) was that the court would, when needed, assist the parties in fashioning alternatives to actual return of seized documents. In this case, confusion has occurred as to who may request and receive a copy of any particular patient file or record or other type of record that was seized from Swannanoa Valley Family Medicine and Dr. John J. Kelly.

While the government has at present a possessory interest in such files as discussed above, the only person who has an assertable property interest in such medical records is Dr. Kelly, not his patients.[3] Besides whatever copies the government needs to make of such files in furtherance of its investigation, the only other person who has a right to copy any such files is Dr. Kelly. Patients have the right to request that Dr. Kelly provide them with a copy

---

[3] Patients have a privacy interest in their medical files, which is not an issue before this court. See In re Search Warrant (Sealed), 810 F.2d 67 (3rd Cir. 1987).

of their file or, if a patient is being seen by a different doctor, the patient has a right to have such doctor make a request to Dr. Kelly to send the new office a copy of the file. As to the patients, therefore, there is no relief this court can afford them inasmuch as possession of such files by the FBI does not alter the routine method for them to seek copies of their files from or through their doctor(s).[4] The court will, therefore, limit its involvement to (1) emergency provision of copies to requesting physicians, (2) establishing a protocol for Dr. Kelly to make copies of his files, and (3) providing patients or their families with notice of the correct method for requesting copies of their files, as follows:

(1) **EMERGENCY REPRODUCTION OF MEDICAL FILES BY THE FBI:**
A physician or other medical health provider who is providing emergency medical care to a patient or former patient of Dr. Kelly, and who is so authorized by such patient, may call either Dr. Kelly or the FBI for a copy of such patient's medical file. Upon receipt of such request, the FBI shall make a copy of such patient's file immediately available to the requesting provider, Dr. Kelly, or allow Dr. Kelly controlled access to the originals so that he may consult with the emergency medical provider. The costs associated with copying and transmittal of any such copies made in such emergency situation shall be absorbed by the government without cost to Dr. Kelly, the patient, or the requesting emergency medical provider. The FBI may impose reasonable identification requirements to assure patient privacy.

(2) **COPYING OF FILES BY DR. KELLY:**
At his own expense, Dr. Kelly shall have access to make routine copies of his files upon reasonable notice to the FBI. In an emergency, Dr. Kelly shall have access as described in part one (1) above. Reasonable notice for routine copying during the period of Monday through Friday from 9:00 a.m. to 5:00 p.m., exclusive of holidays, shall be one business day's notice provided by Dr. Kelly or his counsel to the Federal Bureau of Investigation. Dr. Kelly shall be

---

[4] The FBI has no obligation to make such records available to individual patients or provide patients with copies under the Privacy Act, inasmuch as such agency is specifically exempted. 5 U.S.C. § 552(a)(k)(2).

allowed to install and leave for the duration of the investigation, if necessary, within the FBI office up to two copiers and other equipment and supplies necessary for recreating his files. Dr. Kelly shall be allowed to either designate in writing or bring with him up to four persons at any given time to assist in such copying. Such copying shall be accomplished in the presence of at least one law enforcement officer to maintain integrity of the investigation. Dr. Kelly is encouraged, but not required, to simply block out a number of days for copying, hire a professional copier service to assist him, and bring staff to supervise the building of mirror files. The cost associated with copying shall be born entirely by Dr. Kelly. Additionally, Dr. Kelly shall have access to make copies of his files and documents at times other than Monday through Friday from 9:00 a.m. through 5:00 p.m. by providing four (4) days business notice by Dr. Kelly or his counsel to the FBI. This will allow Dr. Kelly or his staff, designated in writing as set forth above, periods of times at night, on weekends and during holidays to copy the seized records.

(3) **ACCESS TO FILES BY PATIENTS:**
Patients, former patients, and families of patients are advised that the original of Dr. Kelly's medical records are in the possession of the FBI pursuant to a search warrant issued by the district court. Access to such medical records shall be in the same manner as if those documents were in Dr. Kelly's own office. Requests for copies of such documents must be directed to Dr. Kelly, who will retrieve copies of such documents on your behalf. If you desire that Dr. Kelly send a copy of your medical record to another doctor you are seeing, you should make such request to Dr. Kelly or request that such new doctor send a request to Dr. Kelly for a copy of such record. Each doctor may or may not have a form for you to fill out so that you can get a copy of your medical records. **Because the medical files are the property of Dr. Kelly, the FBI cannot provide you with a copy of your medical records.**

Upon inquiry from any patient of Dr. Kelly, the government is instructed to limit the advice given to such patients to the directions and orders specified above. The government may and is encouraged to provide patients with a written copy of this order if possible.

**ORDER**

**IT IS, THEREFORE, ORDERED** that movant John Jay Kelly, M.D.'s Amended

12

Motion for Return of Seized Property is **DENIED**, but movant's request for written procedures and protocol concerning the reproduction of records is **GRANTED,** and the above described procedures and protocol shall govern reproduction and requests for reproduction of documents in this matter.

**Signed: November 8, 2005**

*Dennis L. Howell*
Dennis L. Howell
United States Magistrate Judge